IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ADVANFORT COMPANY,                          )
                                            )
        Plaintiff,                 )
                                            )
v.                                          )   1:23-cv-906 (LMB/IDD)
                                            )
ZAMIL OFFSHORE SERVICES COMPANY             )
   and SAUDI PORTS AUTHORITY,              )
                                            )
        Defendants.

MEMORANDUM OPINION

Before the Court is defendant Zamil Offshore Services Company's ("Zamil") Motion to Dismiss plaintiff AdvanFort's ("AdvanFort") Complaint based on <u>forum non conveniens</u> and lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) ("Motion to Dismiss"). [Dkt. No. 23].[1] More specifically, Zamil, a Saudi company that operates a local shipyard in Jeddah, Saudi Arabia, argues that the Court should dismiss the Complaint based on <u>forum non conveniens</u> because the Saudi courts, which are already familiar with the facts that underlie this dispute, are available, adequate, and more convenient in light of the public and private interests involved, including that all the relevant events occurred in Saudi Arabia and all the relevant evidence and witnesses (other than AdvanFort) are in Saudi Arabia. [Dkt. No. 24] at 2. Zamil also argues that the Court should dismiss the Complaint for lack of personal jurisdiction because Zamil, who has

---

[1] Defendant Saudi Ports Authority was properly served pursuant to 28 U.S.C. § 1608(a)(3) by mailing documents to the Minister of Foreign Affairs at the address of the Saudi Ministry of Foreign Affairs in Riyadh, Saudi Arabia. <u>See</u> [Dkt. No. 33]. It has not yet filed a responsive pleading. Pursuant to § 1608(d), because it was served on September 25, 2023, defendant Saudi Arabia Ports Authority should have filed a responsive pleading by Monday, November 27, 2023.

no United States offices or employees and has never repaired a ship in the United States, did not purposefully avail itself of the privilege of doing business in the Commonwealth of Virginia. Id.

AdvanFort opposes Zamil's Motion to Dismiss, arguing that the choice of its home forum is entitled to heightened deference, and Saudi Arabia is an inadequate and inappropriate forum. [Dkt. No. 34] at 9-10. AdvanFort also argues that the Court has personal jurisdiction over Zamil because it is "a global company that appears to employ individuals in the United States, and in Virginia specifically" and because Zamil has purposefully availed itself of the privilege of conducting business in Virginia. Id. at 34-35. For the reasons that follow, Zamil's Motion to Dismiss will be GRANTED.[2]

## I. BACKGROUND

### A. Factual Allegations

According to the Complaint, in May 2012, AdvanFort, a Virginia-based company that deploys armed security vessels to protect oil tankers and other vulnerable ships against piracy, chartered a former British Navy vessel, the Seaman Guard Virginia, for a period of 36 months. [Dkt. No. 1] at ¶ 23. In that same year, AdvanFort directed the Seaman Guard Virginia to depart the Port of Baltimore for the Red Sea. Id. at ¶ 28. Upon arrival in the Red Sea, the vessel

---

[2] To the extent the Court "has any doubt as to whether [Zamil's] Motion should be denied," AdvanFort has filed a Motion for Limited Discovery on Personal Jurisdiction and Forum Non Conveniens and to Stay Motion to Dismiss of Zamil ("Motion for Limited Discovery") [Dkt. No. 38], requesting "that the Court stay its consideration to allow limited discovery targeted to the factual issues raised therein." [Dkt. No. 39] at 5. Zamil opposes the Motion, arguing that "the Court [] has the factual information it needs to resolve the legal questions in the motion to dismiss, based on controlling Fourth Circuit law, and allowing discovery would only further waste the parties' time and resources." [Dkt. No. 42]. Because the Court finds that this Complaint must be dismissed for forum non conveniens, AdvanFort's Motion for Limited Discovery will be denied.

performed anti-piracy services pursuant to contracts that AdvanFort entered into with commercial fleets.  Id.

In 2013, defendant the Saudi Ports Authority, which owns the Jeddah Islamic Port, entered into an agreement to partner with defendant Zamil to jointly and commercially operate a shipyard at the Jeddah Islamic Port for a period of ten years (hereinafter, "Jeddah Shipyard").  Id. at ¶¶ 30-31.  That same year, the Seaman Guard Virginia needed routine maintenance and minor repairs.  After seeing Zamil's advertisement in a magazine called The Baltic Exchange and reading about the company in The Maritime Executive Magazine, AdvanFort sought the services of Jeddah Shipyard.  Id. at ¶¶ 39, 58.

On September 23, 2013, Jeddah Shipyard provided AdvanFort a quote, which included the corporate logos of both defendants, offering to perform basic maintenance services, including: hull cleaning; hull inspection; anchor and chain inspection and cleaning; seawater valves overhauling; and pipes and steel renewal for $46,550.00 and stated that the "[t]ime frame for [the] above defined works [would be] 12 days in normal stable conditions."  Id. at ¶ 70.  AdvanFort accepted the quote and wired $20,000.00 to Zamil from its Virginia bank account.  Id. at ¶ 72.

On October 19, 2013, AdvanFort delivered the vessel to Jeddah Shipyard's dry dock in good condition.  At the time of delivery, the vessel required only routine maintenance and minor repairs, id. at ¶ 74; however, at some point in October 2013, Jeddah Shipyard proposed that electrical work be performed on the vessel.  On October 21, 2013, AdvanFort approved the proposal.  Id. at ¶ 77.

On October 27, 2013, a fire broke out on the vessel below deck.[3] Id. at ¶ 79. Hours after the fire, the Saudi government issued a report concluding that the fire was caused by an electrical short circuit in the living room.[4] Id. at ¶ 87. On December 15, 2013, the Director of Saudi Arabia's Maritime Administration released a report that attributed the cause of the fire to AdvanFort and the vessel's electrical system.[5] Id. at ¶ 89.

According to the Complaint, on October 28, 2013, the day after the fire, AdvanFort received notice that Jeddah Shipyard intended to undock the vessel mid-repair, which would leave it vulnerable to water damage. Id. at ¶ 99. When AdvanFort wrote to Jeddah Shipyard demanding that it not undock the vessel, Jeddah Shipyard responded by requesting that AdvanFort sign a statement of responsibility for the fire, which AdvanFort refused to do. Id. Jeddah Shipyard then ceased performing any work on the vessel. Id. at ¶ 100.

On December 26, 2013, AdvanFort wrote to Zamil seeking prompt repair of the vessel's fire-related damage. Id. at ¶ 103. On January 25, 2014, Zamil wrote to AdvanFort "denying

---

[3] AdvanFort spends much of its Complaint explaining how it believes that Zamil was negligent in its handling of electrical work and "because of the failures by Jeddah Shipyard to check for and remove combustible material prior to performing hot work, the work taking place on the deck ignited combustible materials underneath the deck." Id. at ¶ 84. Because AdvanFort already litigated and lost this issue in a Saudi court, this portion of the Complaint is not directly at issue in this action.

[4] AdvanFort disagrees with the Saudi government's report because it "did not consider the root cause of the supposed electrical short circuit, nor did it consider that the supposed short circuit could have been caused by the hot work that Jeddah Shipyard had been conducting on the vessel that day." Id. at ¶ 88.

[5] AdvanFort also challenges the Maritime Administration's report because it "contained supposed findings that were demonstrably false," including that "the hot work on the port side (the same side as the fire) had been completed before the fire occurred on October 27, 2013, and that the hot work on the day of the fire was on the opposite side of the fire (the starboard side), even though governmental investigators possessed the hot work permit, which expressly stated that the hot work occurred on the forward port side of the vessel." Id. at ¶ 89. This, according to the Complaint, evinces that Jeddah Shipyard "influenced both reports by improper means." Id. at ¶ 90.

4

responsibility for the fire; accusing AdvanFort of causing the delay in the regular maintenance and scheduled repair by falsely claiming that AdvanFort had neglected to furnish spare parts; and, most egregiously, demanding payment from AdvanFort for purported damage suffered by Jeddah Shipyard as a result of the fire that Jeddah Shipyard had itself caused." Id. at ¶ 104. As a result, on April 14, 2014, AdvanFort commenced a civil action against Zamil in Saudi Arabia in the Third Commercial Circuit of the Jeddah Board of Grievances seeking $825,986.00 per month for damages caused by the fire. [Dkt. No. 1] at ¶ 105. Zamil filed a countersuit, which according to AdvanFort, "falsely claimed that the fire was somehow AdvanFort's fault and falsely asserted that any delay in repairing the vessel was attributable to AdvanFort's own supposed delay in furnishing spare parts." Id. at ¶ 106. Zamil sought $147,523.00 in berthing fees and $717,800.00 in repair costs.[6] Id. The Complaint alleges that, throughout the Saudi litigation, Zamil "sought to taint the legal process," by among other things, pressuring the captain of the Seaman Guard Virginia, Yurii Fedorenko, to change his testimony and making one of AdvanFort's witnesses fearful to testify "against the interests of the powerful Zamil family." Id. at ¶¶ 112, 119. At a hearing that took place on June 16, 2014, the Saudi court stated that it would appoint a marine expert in light of technical issues raised by the action; however, the Saudi court subsequently reversed course. Id. at ¶ 121. Instead, in April 2017, the Saudi court,

---

[6] According to the Complaint, on December 8, 2014, Zamil Offshore, through its legal representative, offered to settle the dispute by wiring 10 million Saudi Royals (approximately US $2.7 million) to AdvanFort. Under the terms of the offer, however, AdvanFort had to: (a) agree that the fire was an "Act of God" and (b) "pay the guys" to have the Saudi Government's report revised to change the cause of the fire, on the basis of which Zamil Offshore would make a claim to its insurer. Id. at ¶ 108. AdvanFort understood the putative settlement offer to mean that Zamil would arrange a bribe to the relevant Saudi authorities, who, in exchange for payment, would amend their report regarding the cause of the fire. Id. at ¶ 109. AdvanFort refused the offer. Id. at ¶ 110.

without appointing a marine expert, issued a judgment dismissing AdvanFort's claims and awarding Zamil $40,000.00 in damages and unspecified berthing fees. Id.

On June 29, 2022, Zamil, through counsel, informed AdvanFort that "unless AdvanFort contacted Mr. Allastair Bisset," Zamil's General Manager, "regarding its plans to remove the Seaman Guard Virginia within 90 days of that letter, Zamil Offshore itself would take 'appropriate steps' to remove the Seaman Guard Virginia including disposing of the vessel. Id. at ¶ 124.

On September 4, 2022, AdvanFort's marine expert inspected the vessel and discovered that it "had been stripped bare and rendered inoperable." Id. at ¶ 127. According to the Complaint, the inspection revealed that Jeddah Shipyard had undertaken no meaningful efforts to preserve or protect the vessel or associated equipment. Id. at ¶ 132. Jeddah Shipyard employees informed the marine expert that the vessel had been removed from the water due to fears that it would sink and become a hazard to local navigation. Id. The inspection also revealed that the vessel "was stripped of all items of value," including among other things, engines, a speed boat, TVs, air conditioners, a washing machine, steering equipment, and anchors. Id. at ¶ 133. The Complaint concludes that Jeddah Shipyard wrongly, and without right, assumed ownership of the engines, along with all the other stripped parts, materials, and instruments. Id. at ¶ 139.

### B. Procedural History

Recognizing that res judicata prohibits it from relitigating the cause of the 2013 fire, AdvanFort filed a five-count civil action in this Court against both Zamil and the Saudi Ports Authority, alleging that it has been "denied use" of the vessel since the fire because of the

6

deterioration of the boat's condition.[7] More specifically, the five-count Complaint alleges conversion (Count I), because Jeddah Shipyard lacked any right to assume authority over or to convert the Seaman Guard Virginia, its materials, instruments, engines, and parts, id. at ¶ 145; breach of a bailment – tort (Count II), because while under Jeddah Shipyard's control, the vessel was destroyed and rendered useless and valueless which was proximately caused by the negligence of Jeddah Shipyard, id. at ¶ 153; breach of a bailment – contract (Count III), because Jeddah Shipyard failed to redeliver the vessel as required by the parties' contract and, instead, only allowed AdvanFort to access the vessel when it had been stripped of all value, id. at ¶ 157; negligence (Count IV), because Jeddah Shipyard breached its duty to maintain the vessel in a workman-like manner consistent with industry standards when it stored the vessel without protection from the elements or security from theft, id. at ¶ 161; and gross negligence (Count V), because Jeddah Shipyard showed an utter disregard to caution amounting to a complete neglect of the Seaman Guard Virginia's safety by exposing it to the elements for extended periods of time and leaving it unprotected from theft, id. at ¶ 167. AdvanFort seeks an award of actual, compensatory, and consequential damages, including lost profits, and punitive damages; an order that Zamil disgorge all money and profits wrongfully obtained; and an award of attorney's fees and costs. Id. at 34-35.

On July 21, 2023, Zamil waived service [Dkt. No. 13], and on September 29, 2023, it filed the instant Motion to Dismiss [Dkt. No. 23], pursuant to the doctrine of forum non conveniens and under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction,

---

[7] Notably, neither party explains why the vessel remained in the Jeddah Shipyard until 2023, especially given that the Saudi civil action terminated in 2017.

7

to which AdvanFort has filed an opposition. [Dkt. No. 34]. Zamil has filed a reply to the opposition, [Dkt. No. 41], and oral argument has been held.

## II. DISCUSSION

District courts have discretion whether to first address objections to personal and subject matter jurisdiction, or to first consider dismissal for <u>forum non conveniens</u>. <u>Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.</u>, 549 U.S. 422, 432 (2007). Because this action will be dismissed based on <u>forum non conveniens</u>, Zamil's Fed. R. Civ. P. 12(b)(2) argument need not and, therefore, will not be addressed.

### A. Standard of Review

A <u>forum non conveniens</u> dismissal "den[ies] audience to a case on the merits," and "is a determination that the merits should be adjudicated elsewhere." <u>Sinochem</u>, 549 U.S. at 432 (2007). A civil action should be dismissed on the basis of <u>forum non conveniens</u> when an alternative forum is (i) available; (ii) adequate; and (iii) more convenient in light of the public and private interests involved. <u>dmarcian, Inc. v. dmarcian Eur. BV</u>, 60 F.4th 119, 136 (4th Cir. 2023). The <u>forum non conveniens</u> doctrine is ultimately "concerned with convenience, not simply the locus of alleged wrongful conduct." <u>Jiali Tang v. Synutra Int'l., Inc.</u>, 656 F.3d 242, 252 (4th Cir. 2011).

### B. Analysis

#### 1. Availability

For a case to be dismissed based on <u>forum non conveniens</u>, an alternate forum must be available to all defendants. <u>Galustian v. Peter</u>, 591 F.3d 724, 731 (4th Cir. 2010). Zamil argues that, as a Saudi company, it is subject to suit in Saudi Arabia, and AdvanFort cannot claim otherwise because previously "it initiated litigation against Zamil Offshore in Saudi Arabia." [Dkt. No. 24]. Although it does not contest that Saudi courts would have jurisdiction over both

8

defendants, AdvanFort argues that Saudi Arabia is nevertheless an unavailable forum because defendant Saudi Ports Authority has not yet appeared in this action and because AdvanFort's claims against defendants would have to be brought separately in Saudi Arabia—suit against Zamil would have to be brought in the Saudi Commercial Court and suit against the Saudi Ports Authority would have to be brought before the Saudi Board of Grievances. [Dkt. No. 34] at 15.

      Neither of AdvanFort's arguments preclude the Court from finding that Saudi courts are available to hear this civil action. Merely because the Saudi Ports Authority has not yet appeared in this action does not prevent the Court from dismissing this action based on forum non conveniens. Moreover, although the parties' Saudi Arabian attorneys dispute whether AdvanFort would have to sue each defendant in a different Saudi tribunal, compare [Dkt. No. 41-2] at ¶ 3.1.1, with [Dkt. No. 37] at ¶ 39, AdvanFort does not cite any legal authority for the proposition that a foreign country is not a convenient forum if a party's claims must be heard by different tribunals in that country. Instead, it cites inapposite cases in which courts have denied motions to dismiss for forum non conveniens when dismissing the actions would split claims against domestic defendants from foreign defendants, thereby forcing plaintiffs to litigate in two different countries. See [Dkt. No. 34] at 15 (citing DIRTT Environmental Solutions, Inc. v. Falkbuilt Ltd., 65 F.4th 547, 551 (10th Cir. 2023)). Unlike in DIRTT, because dismissing this action would not force AdvanFort to litigate in two different counties and because together the Board of Grievances and the Commercial Court have jurisdiction to hear AdvanFort's claims against defendants, the Saudi courts provide an available forum to resolve AdvanFort's claims against both defendants.

2. Adequacy

A foreign forum "is adequate when (1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." Tang, 656 F.3d at 249 (citation omitted). Zamil argues that the Saudi courts are adequate because all parties can come within the Saudi courts' jurisdiction, as evinced by AdvanFort's past civil action against Zamil in Saudi Arabia, and AdvanFort will not be deprived of remedies in Saudi Arabia because it will be able to pursue claims that Zamil "breached a duty of care owed under the terms of a contract, or in the absence of a specific contract, under Islamic tort law." [Dkt. No. 24] at 13. Zamil also claims that AdvanFort has not established that it will be treated unfairly by the Saudi courts because it merely provides "anecdotal evidence of corruption and delay" which this district has found to be "an insufficient basis for concluding that a foreign court is an inadequate forum." Conflict Kinetics, Inc. v. Goldfus, 577 F. Supp. 3d 459, 464-65 (E.D. Va. 2021). AdvanFort does not challenge Zamil's claim that all parties can come within the Saudi courts' jurisdiction[8] and that AdvanFort would have a legal avenue to pursue its claims against defendants; rather, it claims that because "[t]he Saudi judiciary is controlled by the Saudi government, a defendant in this suit, and is marked by capriciousness, opacity, and discrimination," and because the United States Department of Treasury "regularly reports on [the Saudi judiciary's] abuses, observing that the judiciary 'has serious problems with . . .

---

[8] Although the Saudi Ports Authority has not yet appeared in this matter, it also is a Saudi Arabian entity within the jurisdiction of the Saudi courts, and it is not entitled to sovereign immunity. See [Dkt. No. 24-1] at ¶ 4.1.4 ("Under Saudi law, there is no sovereign immunity granted to ministers, government employees, commercial public or private entities, or citizens.").

10

independence,'" it is "extremely unlikely that the courts of Saudi Arabia would adjudicate AdvanFort's claims in a fair and impartial manner." [Dkt. No. 34] at 8.

AdvanFort's argument that the Saudi judicial system, as a whole, is corrupt and thus incapable of adjudicating disputes fairly misaligns with the results of the parties' past litigation. In the parties' 2013 litigation in Saudi Arabia, although the court dismissed AdvanFort's claims, it awarded Zamil only $40,000.00 in repair fees—less than one-third of the $147,523.00 Zamil sought. Also, a court's administrative decision to change course and not "appoint a marine expert in light of the technical issues raised by th[is] case," [Dkt. No. 1] at ¶ 121, alone does not indicate that a court would "deprive[] [AdvanFort] of all remedies or treat [ ] [it] unfairly." Tang, 656 F.3d at 249.

Moreover, American courts have routinely found that Saudi courts are adequate fora and have dismissed cases on the basis of forum non conveniens. See, e.g., Kamel v. Hill-Rom Co., 108 F.3d 799, 803 (7th Cir. 1997) (affirming trial court's dismissal on the basis of forum non conveniens, including its finding that Saudi Arabia was an adequate forum); Forsythe v. Saudi Arabian Airlines Corp., 885 F.2d 285, 290-91 (5th Cir. 1989) (same); Ahmed v. Boeing Co., 720 F.2d 224, 226 (1st Cir. 1983) (Breyer, J.) (same).

Courts have also "uniformly held that anecdotal evidence of corruption and delay provides an insufficient basis for concluding that a foreign court is an inadequate forum." Conflict Kinetics, 577 F. Supp. 3d at 464-65.[9] For example, in Alayan v. Permanent Mission of Saudi Arabia to the United Nations, 2021 WL 1964078 (S.D.N.Y. May 17, 2021), the plaintiffs

---

[9] This calculus does not change when the claim being brought is against a government-controlled entity, such as the Saudi Ports Authority. See, e.g., Forsythe, 885 F.2d at 290-91 (affirming finding that Saudi Arabia was an adequate forum even though defendant was a corporation wholly owned by the Saudi government).

argued that the Saudi legal system was inadequate and "cite[d] allegations of human rights scandals, the detention of women's rights activists, and the murder of a Saudi Journalist[,]" as well as allegations that its process server "was turned away under the threat of arrest" and "was in fear of his life." Id. at *2. The court found the plaintiff's "arguments unavailing," explaining that they "rest mostly on general biases and danger within Saudi Arabia[,]" and cited other cases in which United States courts had found Saudi Arabia to be an adequate forum. Id. at *2-3. Even more recently, in CDM Smith Inc. v. Atasi, the plaintiffs cited the same State Department "Human Rights Practices" reports that AdvanFort cites in its opposition to argue that the Saudi Labor Court was not an adequate forum, but the court in CDM Smith was unpersuaded. See 594 F. Supp. 3d 246, 256-57 (D. Mass. 2022) (finding Saudi Labor Court to be impartial and explaining that State Department Human Rights Reports are inapposite because they are focused on the Saudi criminal justice system, not the civil courts). Ultimately, "[c]ourts must be cautious before finding incompetence or corruption by other nation's judicial systems," Alayan, 2021 WL 1964078, at *2, and the type of generalized claims of corruption pressed by AdvanFort have been repeatedly held to be insufficient to establish inadequacy of a foreign sovereign's courts. For these reasons, AdvanFort fails to support its argument that the Saudi Board of Grievances and the Commercial Court are inadequate fora.

       3. Public and Private Interests

            i. Private Interest Factors

The factors pertaining to the private interests of litigants include (i) the relative ease of access to sources of proof, (ii) the availability of compulsory process to obtain the testimony of unwilling witnesses, (iii) the cost of obtaining testimony from willing witnesses, (iv) the possibility of viewing the premises, and (v) "all other practical problems that make trial of a case

easy, expeditious and inexpensive." Tang, 656 F.3d at 249. Generally, if there is a "real showing of convenience by a plaintiff who has sued in his home forum [it will] normally outweigh the inconvenience the defendant may have shown;" however, this principle is inapplicable where "the plaintiff is a corporation doing business abroad." DiFederico v. Marriott Int'l Inc., 714 F.3d 796, 804, 807 (4th Cir. 2013).

AdvanFort elected to do business with Zamil in Saudi Arabia, and therefore, it "should expect to litigate in foreign courts." As a result, the Court will "partially discount[] [AdvanFort's] United States Citizenship." Id. Moreover, the private interest factors "plainly favor [the] foreign forum" and "favor dismissal on forum non conveniens grounds." In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980, 540 F. Supp. 1141, 1147 (D.D.C. 1982); Conflict Kinetics, 577 F. Supp. 3d at 465. First, "the majority of the actionable conduct alleged in the complaint occurred in [Saudi Arabia], not the United States." Conflict Kinetics, 577 F. Supp. 3d at 465. Because the relevant conduct occurred in Saudi Arabia and because AdvanFort was not in Saudi Arabia when the alleged damage to the vessel took place, the parties will need to rely on physical and testimonial evidence located in Saudi Arabia, including Jeddah Shipyard employees, AdvanFort's marine expert, and physical evidence such as the vessel which remains in Saudi Arabia.[10] [Dkt. No. 1] at ¶ 137; see In re Disaster at Riyadh Airport, 540 F. Supp. at 1147 (finding that evidence in Saudi Arabia regarding alleged negligent maintenance of aircraft at Riyadh airport was "more important to the proceedings").

---

[10] AdvanFort's claim that its "witnesses are located in the United States and this forum," [Dkt. No. 34] at 17, is lacking in support. AdvanFort states that unspecified "potential witnesses in this case are located in the United States, and specifically Virginia," [Dkt. No. 36] at ¶ 6, but it does not identify a single witness. It also claims that "employees who interacted with Zamil reside in the United States or in countries other than Saudi Arabia," id. at ¶ 4, but offers no further explanation of who those witnesses would be and what testimony they would offer.

13

Finally, regarding the availability of both willing and unwilling witnesses, "[s]ignificant costs would be involved in transporting and accommodating [the] willing witnesses . . . from Saudi Arabia" because "more witnesses will have to travel farther distances if trial is held in the United States." In re Disaster at Riyadh Airport, 540 F. Supp. at 1148-49.  Notably, given that this dispute involves events spread over ten years at a Saudi Arabian shipyard—including allegations that Zamil "allow[ed] the vessel to be looted" by third parties, [Dkt. No. 1] at ¶ 153—it is reasonable to expect that litigation of the case will involve third-party witnesses who are not under either party's control.  See Piper Aircraft Co. v. Reyno, 454 U.S. 235, at 258-59 (1981) (noting a lack of need to identify particular witnesses who are not available, especially if they are difficult to identify without "extensive investigation").  This Court would lack authority to compel the attendance at trial of any unwilling Saudi witnesses—a factor that favors the Saudi forum.  See Tang, 656 F.3d at 252; In re Disaster at Riyadh Airport, 540 F. Supp. at 1148 ("[A] United States forum would likely be unable to require the attendance of those foreign witnesses having knowledge of either plaintiffs' damages.").

      ii. Public Interest Factors

Public interest factors in a forum non conveniens inquiry include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty."  Tang, 656 F.3d at 249.  All of these factors weigh in favor of litigation in Saudi Arabia, and not in Virginia.

First, the Commonwealth of Virginia's interests in this case are minimal. Because this action is about a vessel in Saudi Arabia that was allegedly damaged by a Saudi company, with Saudi employees, in a Saudi shipyard in Saudi Arabia, both the Board of Grievances and Commercial Court "seemingly would have a significant interest in hearing a dispute about a contract performed in Saudi Arabia." D & S Consulting, Inc. v. Kingdom of Saudi Arabia, 961 F.3d 1209, 1214 (D.C. Cir. 2020). On the other hand, there is "little local interest" in a case involving an alleged tort arising from performance of a contract overseas. Conflict Kinetics, 577 F. Supp. 3d at 465. In situations where the "controversy's contacts with the United States pale in comparison to the controversy's foreign contacts," "jury duty ought not to be imposed upon the people of the United States nor should United States courts be clogged." In re Disaster at Riyadh Airport, 540 F. Supp. at 1152.

Moreover, forum non conveniens is appropriate in this action given that this Court would be tasked with applying Saudi law. A federal court sitting in Virginia and exercising diversity jurisdiction applies Virginia's choice-of-law rules, and under Virginia's lex loci delicti rule for tort claims, the federal court must apply the law of the place where "the last event necessary to make an actor liable for an alleged tort takes place." DiFederico, 714 F.3d at 807. For contract claims, questions arising from the performance of a contract are governed by the law of the place of performance. Equitable Tr. Co. v. Bratwursthaus Mgmt. Corp., 514 F.2d 565, 547 (4th Cir. 1975). Under both rules, the place of performance and the place where the last alleged tortuous act took place is Jeddah, Saudi Arabia, and as such, this Court would be forced to apply Saudi law. Piper Aircraft Co., 454 U.S. at 260 (explaining that "the need to apply foreign law point[s] towards dismissal").

15

## III. CONCLUSION

For the reasons stated above, the Court will dismiss the Complaint on the basis of <u>forum non conveniens</u> by an Order to be issued with this Memorandum Opinion.

Entered this 1st day of December, 2023.

Alexandria, Virginia

/s/ JMB

Leonie M. Brinkema
United States District Judge